Good morning, Your Honors. My name is John Meyer. I'm here on behalf of Native Ecosystems Council. Council, let me ask you a kind of background question. As I understand it, the area to be partly thinned, partly cut is within around five miles of a small town. Is that correct? It's around five miles of a village of 75 structures, Your Honor. Alaska, we call it a small town. That would be a village, about 250 people or so? Seventy-five structures, homes. It's hard to say how many people live in each home. As I understand it, one of the concerns that was raised in the environmental report was those beetles that kill trees and turn them into extremely dry, easy-to-light kindling. Your Honor, beetles weren't really briefed in this issue. The issue here is... There were no beetles in the forest management plan? There were no beetles in the forest management plan? Yeah. To my knowledge, the forest management plan... I don't know if the forest management plan has directives regarding beetles or not, but the issue in this case, Your Honors... Were beetles discussed as a reason for concern in the forest management plan? Beetles were not discussed in terms of the reasons for this project, Your Honor. My understanding of the reasons for this project is that the area is near a village or a small town... About five miles from... Five miles away. And the record says that it's going to take 10 days for a fire to get there. So I want to be clear, it's not like... Well, as I recall, the numbers were different. Frankly, my experience with Alaska forest fires, your notion of 10 days for a fire to go 10 miles is absurd. And as I recall, I looked up the numbers in the record and they said, yep, absurd. And it goes, I think, something like 15, up to 15 or 20 miles an hour, depending on winds and topography. Sometimes as little as three or four miles an hour. Your Honor, the record says, based on peak fire season, that it would take 11 days exactly for a fire to reach this village of 75 people. To go five miles. Yes, that's what the record says, Your Honor. Counsel, your complaint, of course, alleges a lot of different things and we have a limited amount of time to talk. Yes, Your Honor. I'd be grateful if you could, if you will, give me your best shot. What is your strongest point from your perspective? I understand you think that all of them are strong. Sure. But what is the one, if you could say, you know, if I had to pick one, I'd like you to focus on this because this is my best deal. Which one is that? I think that it's the goshawk monitoring program that the Forest Service has, Your Honor. The goshawk is a management indicator species. They're the canary in the coal mine. If the goshawk's not doing well, then the other species aren't doing well. The forest plan says that the government has to go out there on the ground into each nesting territory and see if there's goshawks using these places. And they've done that for the last 17 years. And they go out there every single year and they go out there after they have cut an area, after there's been timber management. They still go out there and they look and see whether these goshawks are using that area. As I understand it, and correct me if I'm wrong, the unmonitored territories, and I gather the government concedes there were some unmonitored territories, are not in the vicinity of the project area. Is that correct? That's correct, Your Honor. Does that matter? No, Your Honor. Okay. Also, the 2008-2009 survey reports on the goshawk population, they've been completed again in 2008-2009. But they did not denominate the C8 forest plan monitoring reports. Does that make any difference from your perspective?  Your Honor, between 2007 and 2008, there was a 25% decrease in goshawk nesting activities. And so in 2008, the Forest Service never put out a C8 monitoring report. They put out a summary report. And in the lower court, the judge said, that's not a formal report. That's not a finalized report. That's just some sort of draft. And then in the government briefing, they say, well, drafts don't count. Counsel, let's get back to the miles per hour for a moment. I'm kind of assuming, let me tell you where I'm coming from on this. I'm assuming for purposes of my questions, and I don't suggest that other judges assume this, that the administrative agency did its homework badly. It's kind of a C-plus job. But I'm still concerned about what the Supreme Court told us we have to be concerned about. We have to refuse injunctions based on the fourth branch of the injunction test, public interest. And that puts the risk of fire to this village front and center. Now, I thought, I found the number that I thought I had, that fires can move 6.7 miles per hour in forests, 14 miles per hour in grasslands, which was consistent with my ordinary experience, actually. Sounds right. This is a forest, so figure 6.7 miles per hour. You say 5 miles in 11 days. Where do you get that from in the record? Your Honor, on page 152, it says that modeling predicted if the Attenorage area was left untreated, it would take 11 days for a fire that started near the project area to reach the village. And I'd also like to point out, Your Honor, that these homes were- 152, did he say? Yes, Your Honor, 152. These homes are rated at a low ignition risk. The Forest Service has a fire sciences laboratory, and that science department has said that it doesn't matter if the fire starts 5 miles away, 10 miles away. What's going to determine if a home is going to burn down is the area within 100 feet of a house. That's the agency's own scientists are saying that. And so if this area, if the area around the homes within 100 feet is taken care of, then it doesn't matter if we have a catastrophic wildfire. Where is this on 152? I'm looking at it and I don't see it. Your Honor, give me one second. Oh, I think I found what you mean. It doesn't say that a fire in the project area, it says a fire with an origin west of the project area would move through the project area and into Sapphire Village within an 11-day period. It doesn't say it would take 11 days to get there, and it doesn't say it starts there. Within 11 days means 11 at the most. Okay, so conceding that it would take 11 days or maybe 5 days. That's nonsense. Within 11 days doesn't mean you should concede it would take 11 days. I just drove from Fairbanks to Seattle. It took me 7 days because I took it easy. That doesn't mean it takes 7 days. Let's say it takes 1 day, Your Honor, just for the sake of fun. Let's say it takes 1 day. Let's say it takes 1 hour. That's a lot more realistic. Let's say it takes 1 hour. 1 hour is real realistic, and it's just like these fires in Colorado this month. Okay, Your Honor, 1 hour. The government science says that if you've protected your home within 100 feet, it doesn't matter if it takes 30 seconds or 10 days. It's the area within 100 feet of your house. That's what's going to determine if your house burns down. So the individuals who have not cut down all the trees within 100 feet of their house, either because they don't own them or because that's an awful lot of work or because they like the view, their houses can burn, and it's their tough luck, and you should not allow even this tiny forest project to protect them from the destruction of their homes. No, this tiny forest project is not going to protect them from the destruction of their homes because, regardless of what they do in the forest, it's not going to matter whether or not their house burns down. It's about taking individual responsibility. Okay, let's say they're not super responsible. Let's say some of them are kind of old, and they're too poor to hire other people to kill the trees and cut them down. Or let's say some of them don't own all the land within 100 feet of their house, and their neighbors say, no, I like the view, and it's more than 100 feet from my house. So they don't cut them down. Under your view, the public interest branch of the four-part test for injunctions would not allow protection of those individuals from fire? Your Honor, in my view, the public interest prong of the winner's test says that the environment is in the public interest, and protecting the environment is in the public interest. Sure it is. Do you think the public interest, that the public to be protected, consists exclusively of goshawks rather than humans? No, I don't think that at all, and I didn't say that. That came up in that Supreme Court decision that we got reversed in recently, Winters versus somebody. Yeah, it was the Navy sonar case, Your Honor. Yeah, I'm very aware. Yeah, you are as well. So are the three of us. Yeah. So no one's out here to want anyone to be hurt, Your Honor. That's not what we're looking for. Personal responsibility to cut down all the trees within 100 feet of their home, whether they have the physical and legal capability or not. The science says that it doesn't matter what happens on public land. It's what matters what you do on your personal property. That's the bottom line. It doesn't matter what happens on the public land. It's 100 feet on your personal property. The Forest Service is not proposing to go cut on people's private property. We're not trying to stop anybody from cutting on their private property. Wait, wait. You're talking about something that I don't understand the connection to what I ask. You're saying that you have a responsibility to cut all the trees that are within 100 feet of your home, but only if they're on your property. They won't catch your house on fire if your home is 30 feet from the property line. Is that right? All I can say, Your Honor, is that the public interest is a balancing test. And I think in this case, since the Forest Service can't go cut on people's private property, it doesn't really come into play. And if you disagree, that's where we're going to have to. Well, no, I'm asking you, why wouldn't it apply to this really tiny project, a couple hundred acres in what, an 80,000-acre forest that's within five miles of the village? Your Honor, the project in this challenge is going to impact much more than the 852 acres that it's going to affect because we're challenging the Gassauk monitoring program across the entire forest. So it's not like it's just one small area at stake here. It's the way the entire forest is being managed. And this village is expendable. No, I didn't say that, Your Honor. No one has said that. The Forest Service scientist has said that you protect the area 100 feet from your house and you're good to go. That's the bottom line. And you assume that everybody can do that? Yes, I do, because in the record, nothing says otherwise. Now, in terms of the Gassauk monitoring. Is there a record to tell you that some people that get to be 75, 80, 85 years old, they're not so good with a chainsaw anymore? Your Honor, I don't know how that factors into any of the arguments that we've made in the briefing. Anybody with a chainsaw? If you don't mind. On a neighbor's property? Your Honor, we're going to have to agree to disagree. And if you don't mind, I have seven minutes left, so I'd like to continue with the heart of our argument. Good luck on the rest of it. Thanks. So the Forest Service has a forest plan, and that requires them to go out there on the ground and look at to see whether Gassauks are using this area to nest. Counsel, I've read your materials really carefully, and I get your point about the Gassauk. It's very clear that the agency did not cover all of the forest. Yeah. And you've indicated that the fact that it's not specific to this project. Indeed, I gather you all have admitted they did cover it in the project area, but I'm not sure about that. Yeah. What we seem to, or at least I'm wrestling with, is what do we do about this failure? Under neighbors of Cutty Mountain, the fact that it's not site-specific doesn't necessarily get them home free. On the other hand, it looks to me like the only decrease years that could trigger further valuation were 2007 and 2008. Is that a fair assessment? No, Your Honor. I think that the problem we have is that the Gassauk is a management indicator species. I understand. The government has actually gone out and surveyed. They've looked at whether these birds use the areas after cutting, but then they've never used that in their environmental analysis. That's the problem. They have all the data. They know whether or not birds are using that area or not, but then they've never used any of that information. Instead, they use science from California, from Arizona, wherever else. Is that, what's it called, Norton or whatever? There's a photo. Yeah, the Reynolds report. Yeah. There's a study that was done, and it covers density and all that stuff. I think they're relying on that. Am I mistaken about that? To some extent, they are relying on that, but the problem we have is that they're not relying on their own data. They're not using their own data. They've been going out there and surveying for 17 years, but then they've never actually used it in any of the analysis. The government briefing says we don't have to use our own data. We don't have to look at how management impacts the management indicator species. I should probably have this at the tip of your tongue. Where in the record would you cite me where the government says what you've in essence indicated here about the Gossack? Are they saying we don't have to do that? It says on page… This ER? Yeah, ER 174. It says monitor known territories for occupancy in timber compartments where stand-altering vegetation treatments occur. Monitor from planning through implementation and for three years post-treatment. If occupancy is not maintained through implementation, evaluate habitat conditions in the next stand. I understand it, and again, correct me. You're an expert in this, I know, and I'm not an expert, but as I looked at this in the SER Volume 2, 518, the government indicated that the reduction was likely due to unusual cold, wet, harsh weather during the 2008 nesting period, and it goes on from there. And under forest guardians and our obligation to defer to experts, in this case the agency, isn't that sufficient to fill in the blank that you're talking about? And if not, why not? No, Your Honor, because on page 120 of the ER, that's the forest plan, it says that the agency has to look at output management prescriptions, effects to be measured. And then it says for the data source, you have to use project EAs. So the agency has not used the project EAs from the past. They've never looked at how timber impacts goshawk nesting territory, even though they've gone out and surveyed afterwards. I don't understand quite what the defect is. I look at the report, and starting at page 161, it looks as though they're doing annual surveys where they actually walk through the forest, count goshawk nests, and observe each nest to see whether it's currently in use or is now a historic nest. That's correct, Your Honor. So it looks as though they have done that. They've done that part, and that's great. We applaud the agency for doing that. The problem is that they never then used that information in their analysis. That's the problem. It's like if, Your Honor, if the three of you are living as neighbors side by side, and you've each lived in your own house for the last ten years, and now all of a sudden, as your landlord, I decide to rip off one of your houses. And I check the next day, and nope, you're not there. So I write that down. Judge Smith's not living there anymore. And then I do the analysis, and I say, well, how does remodeling people's houses, how is that going to impact them? And it's like, well, we're not going to look at the fact that we just tore off Judge Smith's roof and he's not there anymore. We went there and looked and said, Judge Smith is not there. We tore the roof off his house. But we're not going to look at that when we do the analysis. And that's the problem we have because the forest plan says specifically that you have to use the project EAs as a data source when you're determining the impacts to goshawks. If, arguendo, if you're correct about this, and let's just say putting aside all the other allegations, what would be the remedy from your perspective? Any time a site-specific project is not consistent with the forest plan, then you have a violation of NFMA. And the correct remedy is to vacate and remand, Your Honor. Even if the public interest counsels otherwise? Your Honor, I would ask that since we didn't brief it, I would love the opportunity to brief an appropriate remedy. You had a chance to brief your case. You're saying if we're not going to go your way, you want a second shot at briefing? No, I'm saying that if you decide that the agency has violated the law and you decide in our favor that we'd like a chance to brief the remedy, Your Honor. But even if we don't have an opportunity, the public interest factors in favor of the environment for the reasons that we talked about earlier. I asked you to hypothesize at the beginning, and you said, well, I don't want your vote anyway. I'll take the other two. What you said was that suppose that the forest plan was violated, we still, I believe, under that Navy sonar case, have to consider the public interest as well as whether there was a violation. Correct, Your Honor, and I think in this case the public interest favors. You say the only public interest to be considered is the interest in preserving goshawks, and that's where I lose you. I don't understand what legal basis you have for saying that. Your Honor, I don't. The public interest factor, you have to look at both the environment and other things that are going on according to the winters versus NRDC case. So I'm not asking this Court to only look at the environment. I'm not asking this Court to only look at goshawks, Your Honor. But I do think that when you look at the public interest, it lays in favor of protecting the environment. And I say that because, in this case, the agency's own scientists have essentially said this project isn't necessary in regards to protecting homes. Well, actually, we don't even get to winters, I don't think, if you're correct, because all we would be finding is that there was a violation and we send it back for further action. There's no injunction, I don't think, involved, is there? I don't think so either, Your Honor. That's all the winters versus NRDC dealt with, injunctive relief. Yes, Your Honor. A fourth prong applies in an injunctive situation. Yes, Your Honor. Incidentally, on your analogy where you're trying to show that they didn't use their own data, it was your analogy to going by somebody's house one day and it's not occupied. It doesn't seem to fit what the monitoring and inventory report says. It says if a nesting area was monitored for at least eight out of ten years with no evidence of reproductive activity, the nesting area was reclassified from active to historic. That's correct, Your Honor. That's very different from looking at it once and seeing if there are any birds in the nest. Like I said, if the three of you live together as neighbors for ten years and someone tears the roof off of one of your houses, you're going to go back and continue to see if they live there. And the agency did that part. I agree. But the part that they didn't do is they didn't use that data that they had. They went through and they figured out if someone tore the roof off your house, but then they never – Let's get back away from the analogy now to what they actually did. They monitored for eight out of ten years with no evidence of reproductive activity. And then they never used any of that monitoring data, Your Honor. They never looked at how timber management impacts the habitat for gouse hawks, even though they had went through and surveyed after they had cut down the trees. We're going way over time. We are, Your Honor. Thank you for your time. Thank you. Good morning, Your Honors. I'm AUSA Mark Smith for the Lewis and Clark National Forest. Could you show us where the agency did look at how cutting down the trees would affect the gouse hawks? So the gouse hawk analysis is a huge part of the case here, and I'd like to get right into what counsel was discussing. Counsel tries to conjure a requirement that's not in the forest plan when he says the agency is required to compare the monitoring data from managed areas with monitoring data from unmanaged areas. You just can't find that in the forest plan. So getting back to the question I asked Mr. Meyer at the beginning, I pointed out my understanding that the non-monitored area of the gouse hawk, at least as I see it in the record, was not within the project area. Is it the government's position that that in and of itself basically takes care of the point? Because you're only looking at this particular area, it doesn't matter if it's outside, and you say that's not required by the forest management plan. Yes. Not only was it not in the project area, it was way far away from the project area. It was 80 miles away from the project area. So this one area that wasn't monitored had nothing to do and could have no impacts on what was happening in the project area. The agency monitored 98% of every known gouse hawk territory. They sent a guy out, and he would listen for bird calls in this area. He would play a bird call, and then he would record his findings. That's a method that's been subscribed to and sanctioned by the scientific studies. And is that an under lands council? That's sufficient, is it not? Yes, that is sufficient. And the one area that they couldn't access is in the middle of the Bob Marshall Wilderness. It's inaccessible by motorized means because it's a wilderness. And I think the year that they couldn't make it in there, there were weather problems that prevented them from getting in there. So from your perspective, a gouse hawk is a red herring? I believe so, at least with respect to this 2% deficiency in the monitoring. That failure of monitoring in that given year really has no bearing on this project. Can I switch you just for one second to another portion of the plaintiff's case here? And that has to do with the support in the record for the P-1 type protections. There's been some suggestion that Native Ecosystems Council versus Weldon has some bearing on this. Would you comment on that? Does that case have anything to do with this case as far as the P-1 issue? Well, and I guess I would like to chime in on the photo interpretation type methodology for the elk hiding cover issue. This is an issue that was never raised in the administrative appeal and was never raised in the district court. The district court treated it as waived. Did it not? It did, indeed. And here's the problem. I'm going to try and explain this methodology to the court, and I'm going to try when I do to sound like a biologist. And I'm going to try and sound like I know what I'm talking about. The fact is I'm not a biologist. I'm not a scientist. I'm a lawyer. It's really, really important for the agency to have an opportunity to let their experts explain these problems. And plaintiffs frame the issues in their administrative appeal. If they don't raise the issue in their administrative appeal, the agency's scientists never get a chance to speak to it. And that's why the administrative exhaustion requirement is crucial and why this argument should be waived or not addressed by this court because plaintiffs failed to exhaust it. Okay, so the photo interpretation type methodology is what it says in the forest plan the agency has to do to assess elk hiding cover. Basically it works like this. The agency looks at TSMRS, right, that's timber stand management recording system data, and aerial photos. And photo interpretation types, then, are established based on those things. They look at the aerial photos and they take a cutout of an elk into various types of stands, right, two-dimensional life-size cutout of an elk, and they go into various types of stands. And they have hundreds of sample plots that they use. And they say, all right, in this stand we're getting 40% coverage value. Let's see what the aerial photo looks like. And they establish correlation values over these hundreds of plots. And they basically get to the point where they've taken enough of these things, measured the cover, and then they note the correlations. Did we approve this type of analysis in Forest Guardians? I'm not certain. I'm not familiar with that case, Your Honor. Yeah, it's 329 Fed Third, at least I'm looking at page 1097. You don't have to look it up right now, but it's – It looked to me like this was used before and our court approved its use. And the factual pattern was different, but the concept was the same. And it's been proven reliable. I mean, the Montana elk logging study actually went in on the ground. So they looked at aerial photos and they determined that the cover value of these particular stands that they sampled, which were 22, 22 different stands, cover value is going to be 46.7. They went in on the ground to those same stands, and it turned out the actual value was 46.2. So clearly the method is reliable. Plaintiffs have claimed that it's unreliable, but, you know, they don't address this point. And, again, this issue wasn't raised in the administrative appeal. The next thing that the plaintiffs argue is that, well, it can't be accurate because you can remove underbrush, and that won't be reflected in the canopy. Well, again, I'm no scientist, but I believe the way that this works is that the canopy that you can see in an average by a certain number of stems, right? By stems I mean, you know, tree trunks. Forest Service has determined with their two-dimensional cutout and with hundreds of test plots that certain canopy types with certain textures, certain heights, and certain stocking levels equate to certain cover values over 200 feet. Standard here is essentially high in elk at 200 feet. This is the Montana rule? That's correct. And it's different in Montana than it is in Idaho, for example, because the forests in Montana are more xeric. Okay, that means they're drier forest types. Unnaturally dense underbrush could hide an elk at less than 200 feet, could hide that elk at 100 feet, could hide that elk at 50 feet. What do we have in this project area? We have unnaturally dense fuel accumulations that have begun to get denser and denser and denser since we've started suppressing fires in the area. Removing those understory seedlings and saplings while leaving all trees greater than 14 inches, leaving snags, leaving a minimum basal area, that all brings the stand back to the type that's represented in the canopy that provides that level of hiding cover. So plaintiffs' sort of methodological attacks against the elk hiding cover method, they fail, and the failure is rooted in plaintiffs' lack of understanding of the methodology. Help me on this. My understanding is that the agency has come up with this Montana rule, has tried it and so on, and from the perspective of its scientists, it is substantially, you know, highly accurate. My understanding of the perspective of Mr. Meyer and his group is that they have done some analysis and they come to a contrary conclusion, claim that it is not nearly accurate enough because of the undergrowth factor and so on. In a situation like that, what does our case law say we are to do? We have two competing scientific methods and each is explained, you know, there's an explanation as to why each side reaches its conclusions. Your Honor, I think this Court and your Honor. I'm familiar with the case. And land's counsel had the perfect solution, corrected the erroneous trend of previous cases, which ignored the APA's deferential standard of review and required the reviewing court to assess the reliability or the significance of on-site scientific monitoring reports. Land's counsel correctly held that it really shouldn't be this court's role to assess the quality and the detail of on-site analysis. We really aren't qualified here. I mean, I very much respect Mr. Meyer's organization and I respect what they're doing. But in this particular, some part of this, I don't see how I can do anything other than defer to the agency. I'll be interested in his thoughts on rebuttal on that. But you've got two scientific perspectives. If we're not scientists, how do we decide this otherwise? Otherwise, it's just conundrum. You just keep going on and on and on and on. And in this case, the agency has certainly shown solid backing, whether you agree with it or not, and says this works, this is good. And Mr. Meyer's group has come up with some other information. They say, no, it's not good. It's got this problem and this problem. But the agency has looked at it, it's considered it, and it shows its own approach under Land's counsel, which was a unanimous en banc court decision. We're bound by the agency's decision, are we not? Yes, sir. And I think the problem is compounded in this case by the failure to exhaust at the administrative level. The agency scientists never had an opportunity to fully address the problem, so now plaintiffs are kind of trying to do an end run around agency expertise to which this court would defer. There's plenty of support in the record for the methodology, nonetheless, and it clearly shows that the methodology is reliable and that LCOVR is going to be maintained in these areas. Help me with a little detail on the reasons for the agency's choice of alternatives. When I raised Beatles, the appellant argued that Beatles were not properly an issue in the case, not having been briefed. And I was confused by it because pages 153 and 154 have extensive discussion of how the amount of dead fuel is increasing each year due to mortality from Beatles. Fires will be increasingly difficult to extinguish because of Beatles. Mountain pine beetle is quite prevalent. Mortality is significantly increasing dead fuel. Problem with the no action alternative is increased tree mortality from insects and disease is evident in the current insect epidemic in the project area. Have I got something wrong? Are the Beatles irrelevant for some reason that I missed? No, the Beatles are highly relevant, and in fact they reinforce the rationale for the project. Beatles are epidemic in Montana right now, and I guess while I'm talking about epidemics in Montana, we had like not one drop of rain in all of June. Much of Montana is on fire right now, and pretty much all of central Montana is under critical fire conditions right now. This project is designed to address that problem by diminishing these really thick stands, unnaturally dense stands of fuel. Oh, you have that going right now? Right now. It's like in Colorado? Right now, yeah. And there's one fire that's going on right now that's 244,000 acres. It has burned down 20 houses. There's 400 displaced people. So this project is designed to mitigate that danger, and it will also help the mountain pine beetle problem because as you thin out trees, the remaining trees get stronger, and they can pitch out the invading beetles that are going to come in. So the mountain pine beetles move across the landscape in a wave, and this will tend to defeat them in stands that have more vigor. So the beetles are relevant? They are relevant. They are relevant to the thinning project. That's another reason why it's a good idea. Also, after pine beetles move through an area, you have stands. You can see it as you're driving along the highway of red trees, all these red pine needles that will torch with unbelievable ferocity. So after the pine beetles move through, you've got even more of a fire danger. And this is why the Sapphire Village was listed as a community at risk by the Judith Basin County, by the Federal Register, and why the adjoining landowners and homeowners asked the Forest Service to do this project. And let me clarify something else. It's not just the houses. It's the property. There's extensive private property directly adjacent to these project areas, and the people there value their property for the same reason the plaintiffs claim to value public property, because it's forested and it has beautiful habitat values, and wild animals want to come onto this property. Well, if a wildfire comes into this area now, it is going to be immolated, and there's not going to be any habitat values. So the project is important because it addresses that concern as well. I'd like to address some of the other issues that plaintiffs raised with regard to goshawk monitoring. The 2007 and 2008 C8 monitoring report, that is a red herring. Could you talk a little bit about the claim that a fire would take 11 days to get five miles? Yeah. As was stated in the brief, that assumes a best-case ignition scenario. It describes an ignition complex that would occur somewhere east of the project area, then burn through the project area on its way to Sapphire Village. As Your Honor correctly pointed out, that could take anywhere up to 11 days, and it assumes a best-case scenario in terms of prevailing weather conditions. If it's windy, if it's dry like it is right now, if it's hot like it is right now, plus 100-degree temperatures, it could easily move, cover that distance in far less time. I'd like to give the Court a little bit of a few numbers, I guess, to help understand really what we're talking about in terms of goshawk security. In the Forest Service Region 1, which is where this project happens, there has been no decline in populations or habitat. To the contrary, the extent of forested habitat and goshawk habitat have increased. The impacts of timber harvest on goshawks is insignificant. It's 0.09% of the forested landscape as of 2004. In these particular timber subcompartments where this project is going to happen, we've got 37.8% and 17.6% old growth, which is well above the 5% requirement, right? Goshawk is an old-growth monitoring species. I'm going to just be sure, Mr. Smith, I understand something correctly. Mr. Meyer indicated that goshawk is his best point, and primarily because he said, I believe, that the forest plan requires a discussion of the analysis of the agency as to why its particular review of goshawk habitat and the like is accurate. He said he commends the walking through the area and so on, but that isn't really included in the report. My understanding of your response is you don't have to do that because the forest plan doesn't require you to take into account something that's outside the project. But in this case, as I understand it, the walking through the forest really is within the project. That has, in fact, occurred, and I think Mr. Meyer said that wasn't included in the report and its reasoning. Would you respond to that, please? Sure. I believe the plaintiff's claim is they acknowledge that 100% of the project area was monitored. They acknowledge that all monitoring occurred except for this one area that is in this remote wilderness, which is not affiliated or going to be impacted by this project. What they're claiming is that the Forest Service needs to take monitoring data from around projects, like management, like the stinning project, for example. Okay, so that's a little different than I understood from before. They're saying you have to take it from around, but I think he said that the forest plan required you to at least discuss the results of your analysis within the project. Now, he can correct me if that's wrong, but if that's correct, does the plan include a description of what the results have been of the monitoring within the project? I'll give you the exact answer. If you don't mind starting off, yes or no? Oh, I'm sorry. Does it include that? Does the project analysis include what was done and the results of the study of the goshawk population and habitat within the project area? Yes. It does? Yes, it does. Plaintiffs are complaining. Do you have a reference in the record on that? The analysis of the goshawk in terms of the impacts within the project area is so extensive, I can give you several. Just any of them is fine, just maybe a beginning and end point, or at some point it doesn't really matter if I have the whole thing when you find it. Sure. With regard to nesting habitat, I would refer the court to supplemental excerpts of record 455 to 456. With regard to foraging habitat, it's the same. And I guess to speak further to that point, we have to understand the context in which this project is occurring. Nesting habitat, the experts recommend that six alternate nest sites be retained. This project is going to retain 10. I understand. Experts recommend 30-acre alternate nest sites. These are going to be 40 acres. Experts recommend 240 total acres. Well, we're going to have 568 total acres. So from the perspective of the agency, you have met and exceeded the requirements of the law in this setting? By a substantial margin. Okay. With regard to nesting habitat, the experts say you've got to have, for a project this size, you want to have 3,600 acres. This project is going to retain 27,000 acres. With regard to foraging habitat, the experts say you need to have, let's see. So this project's going to impact, it's going to treat 227 acres, as was noted, a pretty small area. Even if all of those acres were eliminated as foraging habitat, the total foraging area that was in this analysis area is 75,000 acres. So, I mean, that doesn't even show up in the percentage value. So from the perspective of the government, the goshawk issue is a non-issue? Correct. Goshawk are secure. This project is actually going to benefit goshawk because the way goshawk work, they prey on species within the trees. They actually fly through the trees. That's kind of what makes them cool. They prey on species like ground squirrels and jays and grouse and so forth. And if the understory is too dense, they can't see that prey. They can't fly down and get it. So all of the scientists that were cited in the record here, Squires and Kennedy, Reynolds, Crocker Bedford, Patla, they all showed that if a project thins out this understory by cutting from below, uses prescribed burns of moderate intensity, and slashes while retaining larger trees, which is exactly what this project does, that's good for the goshawk. Let me ask you a question. On the explanation for why you only have a 20 change from the treatment in 20, whatever they are, so that you arrive at the same 40%, you say the reason that it's only a change is threefold. One, the burning, the trimming, and the slashing. Would you explain why, if you take those three, it's only 20 acres, or 18 acres, I think, that will be affected? Oh, I see what you're saying. So with regard to goshawk habitat? No, no, no, not goshawk. I'm sorry. That's okay. This is the elk. Oh, okay. You say there's only a 20 acre change. 20 acre change in hiding cover value, Your Honor? Yeah. I'm sorry. The change, you're at table one, the effect of hiding cover. And you say it's still up to the 40%. Okay. And you say that because it's only a 20 acre change from categories. Well, and again, this is, the hiding cover methodology and the PI type methodology is complicated. No, that's, yeah, that's the right methodology. Yeah. But I'm talking about the result you get from the use of that methodology. Okay. And I'm afraid. You're supposed to explain that, aren't you, so that we can follow, even though we're not scientists, that somebody can read that and say, no, they're wrong. Yes. It isn't the 20 acres. Yeah. And the only explanation I can find is it's based on assumptions. And the first assumption is that with respect to the amount that's burned, that it'll come back someday. You quote from the report, and this is similar to the question Judge Klinefeld raised, about 11 days. You know, well, maybe it's one day. Here you say burning these sites with light to moderate fire intensity will over some time, will over time return it to historic levels and meet the desired overall objective of the project. That's from your report on which you're relying, the fuels report. Well, what does that mean? That someday it'll be okay, but for how long won't it be okay? So that's the assumption on which you rely for this. There are two other assumptions which don't seem much more explanatory. Now, if it's not 20 acres, if it's 100 acres instead, then you don't meet the qualifications that you have to, right? So what does that tell us about your method of arriving at 20 acres? The second thing is even if these were true, these three assumptions, and they told us something, it just says based on these assumptions, I guess it comes to a total of 18 acres or 17.9. There's no explanation of how we get to 17.9 instead of 35, for instance. Can I ask which pages in the record Your Honor is referring to? 210 is the explanation, and 211 is your table. Okay, and my answer has to be in many parts just because your point was made in many parts. The diminution in cover value, I think, that the forest is talking about is going from a higher than required minimum value, i.e. 60%, down to 40%. The cover value that they're talking about reestablishing over time is going to be the reintegration of these shrub values, which occurs naturally in these areas and is controlled by moderate to low intensity burns rolling through these wooded areas as they have historically done every 10 to 20 years. So what is going to be removed is what is in excess of the cover value right now. The method by which the cover is calculated actually is complicated as well because it's calculated by timber subcompartment. Every timber subcompartment is comprised of scores of stands. Every stand can have a different PI type. So you have to take every PI type, multiply it by the number of acres that are existing in that PI type, and then divide it by the total acres of the timber subcompartment. So even if you have a downgrade in cover in one particular type of stand, it may not show up in the complete acreage of that timber subcompartment. Plaintiffs never did the math because they never understood the methodology because they never raised this issue in their administrative appeal. How many acres of elk cover are we talking about, did you say? Eighteen, did you say? I think Judge Reinhart's looking at a table, which I don't have in front of me and I can't recall off the top of my head. I was thinking that's just a few hundred yards by a few hundred yards, isn't it? Yeah. Elk, we don't have elk. We have moose in Alaska, and I think elk are smaller, but they still cover more than a few hundred yards pretty much every hour. They're not sleeping, don't they? I'm not questioning that if it were only a few hundred yards, if it were only 20 acres, that would be all right. I'm trying to figure out how we get from reading this report to understand that it really is only 20 acres. Now, maybe it's irrelevant for two reasons. Maybe it wasn't raised and it's waived, or maybe Judge Smith would tell me that if you've got one set of experts who say it and then the plaintiffs come in with another set that we're going to rely on the government's experts because that's what land council says. So those are two reasons. This may be irrelevant, but assuming that it's raised and assuming that you have an obligation, even though you've got experts, to explain how you got to this 20 acres, which, as Judge Kleinfeld points out, so what with the 20 acres? But if maybe it should be 50 acres or 70 acres or 100 acres or whatever, all I'm really asking is how we can tell from this, if we're supposed to do that, how do we tell that it really is 20 acres? Because, one, you give some assumptions which sound not very persuasive, and, two, you then don't tell us how, even if we take those assumptions, they turn out at 20 acres. Right. And, again, I'm hamstrung here somewhat, Your Honor, because this issue wasn't exhausted at the administrative level, so we couldn't make the record. Well, if that's it, that takes care of it. Yeah. That's it. I'm hamstrung, too, because even if you really explained it, I wouldn't understand it. Well, it's very complicated, and in particular the way that it's ‑‑ Is it really that complicated? I'm thinking if somebody bought some property that was forested and had elk and he decided to clear 20 acres for his dairy herd, the elk wouldn't all just stand there and die. They'd probably walk into the woods. Right, which is why the biologists and the forest manager and the timber management officer here thought it was very important to have, you know, the mosaic pattern that we're talking about and to retain 100 square feet of basal area per acre. I mean, the plaintiffs are trying to portray this project as leaving behind this barren forest floor. That's not going to be the case at all. We're going to have a robust forest community with diverse habitat types. I think your plan is to have the forest about like it was 100 years ago, isn't it? Exactly right, exactly right. Thank you. Thank you, Your Honors. Your Honor, a year ago in Portland we were in front of you on the railroad case and you said you haven't explained how flying over a place, you haven't explained your methodology, and that's what we're saying here. You remember I ruled for you in that case. Yeah, how could I forget? The only one you won all year, right? Yeah. But, again, here I would be grateful for that one was pretty straightforward. I mean, the record, there's just no way they could have possibly seen fish in the river from an airplane. I mean, it's just ludicrous. And they did a terrible, terrible, terrible job on their work. You guys did a great job on that case. Thank you. But we have to take these cases one at a time. Absolutely. And in this particular case, when you look at the methodology, let's take the Montana rule issue. Isn't it correct that under Lance Counsel, if you have your scientists and they have their scientists, as long as each has explained the methodology and it's not absurd, we have to defer to them. Isn't that correct? That is correct. Okay. Well, let's talk for a minute about Goshawk again because I know… Go ahead. Before we go back. In 2009, the government created this new criteria, the cutover criteria, and they said we're only going to reduce security cover if you can see evidence of roads or if you can see evidence of some cutting unit boundary. And the agency never explained how roads have any correlation. They never explained that new methodology. They didn't go out there. They didn't use studies. Like in the 1982, they used elk cutouts to figure out, yeah, this methodology actually works. But in 2009, they created this new methodology, and they never put an elk out there and said, yeah, if we put roads, now all of a sudden you can see elk. They never explained their methodology. They never used studies, Your Honor. I thought, correct me if I'm wrong, I thought they used a 1982 study supplemented by applying the Montana rule with the flyover deal. Is that wrong? I would argue that that is wrong, Your Honor. Wrong in what they did or that I misunderstood the facts? That you misunderstood the facts. Okay, what are the correct facts? My understanding is that in 2009, the Forest Service created a new methodology in which they said an area will be reduced if it appears to be cut over. And in order for an area to appear cut over, you're going to have to have roads or you're going to have to be able to see the cutting unit boundary. And that was never addressed in the 1982 elk logging study. That's an entirely new methodology. We'll look carefully at that. Okay, thank you, Your Honor. I promise you that. On the goshawk issue, I think you guys are squarely joined in your contention here. Mr. Smith says that, number one, the forest plan does not require the government to discuss goshawk management in areas outside the project area and that they did, in fact, do what was required within the project area. If I understood you correctly, you said that's not right. You've got this area that wasn't covered. And, moreover, even if they did walk it inside, they didn't talk about what the results were, and that's a fatal point. Do I understand that correctly? Maybe I can rearticulate real quickly. We agree that the agency did a good job of walking through these areas. They did walk through this specific area. They've been walking through this specific area for the last 10, 17 years, and they've been walking through all these other areas of the forest for 17 years. But not including that remote area. Exactly, yeah. And that's okay. The problem that we have is that you've been collecting this data. You walk through an area. Before it was cut, you said there were goshawks here, or maybe there weren't goshawks here. You've got all this data. And then you go and survey after the goshawks, after the timber cutting, to see if there's goshawks. But the Forest Service never used all of that data for 17 years in their environmental analysis. They used it to determine that the limitation on goshawks was not availability of habitat. It was territorial predation by various types of owls on the goshawks' eggs. They never said that, Your Honor. I think they did say it. I think I read it in the report. They never said it's not because of timber. They just said it might be weather or it might be prey. They never said it's not because of timber. And even the Forest Service biologist said, hey, the Forest Plan says we need to look at the Project EAs. The Forest Plan says look at the Project EAs. If you don't mind, Counselor, could you give me a side on that? I think you and Mr. Smith are disagreeing about that. You're saying that the Forest Plan requires you to do this. He's saying they've complied. It does not. What in the statute or in the plan are you referring to? It's page 120, Your Honor. Is that of the plan or that's the ER? That's the ER. And that is the page in the plan that's relevant here. So that page in the Forest Plan says data source Project EAs. Incidentally, page 164 is what I had remembered reading. And it says habitat does not appear to be a limiting factor for goshawk. The barred owl represents a significant influence on northern goshawk abundance and distribution due to predation on young, they cite a study. And the great horned owl, which is a common species in the forest, is also a predator of goshawk nests and fledglings. They cite another study that found that territorial behavior, not habitat, was setting the upper limit to northern goshawk population growth rate. Were you saying that that's not true? Your Honor, I was saying that the agency has not pointed to a place in the record where they looked at this monitoring data that they've been compiling for 17 years and then said, we've been collecting this data for 17 years and we've used it and here's why we think that we're going to protect habitat or we're not going to protect habitat. I thought what I just read was the inference from that data. I didn't hear anything about timber management in what you said, Your Honor. I just read it. Habitat, I thought was. But does it say anything about timber management? Oh, you think timber and habitat are two different things? Well, it says Project EAs and I think that timber management falls into the Project EA category, Your Honor. All right. We have a lot to figure out in this case. Thank you, Your Honor. Thank you both very much. The case just argued will be submitted. The court will stand in recess for the day.
judges: Reinhardt, Kleinfeld, Smith